Richard FOUGHT, et al.,
Plaintiffs–Appellants,

v.

EVANS PRODUCTS COMPANY RACINE PENSION PLAN AGREEMENT, et al., Defendants–Appellees.

No. 91–3538.

United States Court of Appeals,
Seventh Circuit.

Argued April 27, 1992.

Decided July 2, 1992.

Miriam R. Katzman (argued), Zubrensky, Padden, Graf & Maloney, Milwaukee, Wis., Daniel B. Sherrick, UAW Legal Dept., Detroit, Mich. and George Graf, Gillick, Murphy, Wicht & Prachthauser, Brookfield, Wis., for plaintiffs-appellants.

Kael B. Kennedy, Kirk D. Messmer, Allan Gunn (argued), George J. Matkov, Jr., and Beth E. Koch, Matkov, Salzman, Madoff & Gunn, Chicago, Ill., for defendants-appellees.

---

Before CUMMINGS, EASTERBROOK, and RIPPLE, Circuit Judges.

EASTERBROOK, Circuit Judge.

Racine Steel Castings Company lost money, and together with its corporate parent Evans Products Company filed for bankruptcy in 1986. Both firms liquidated. Evans Asset Holding Company (EAHC), formed to sell off the corporate family's assets, acquired and quickly sold Racine Steel's plant. The buyer, B & R Holdings, Ltd., assumed none of its predecessor's liabilities but did hire most of its employees. EAHC dismissed its employees in April 1987 and terminated Racine Steel's pension plan at the end of January 1988, distributing to its employees all of their vested benefits. Some of the former employees believe that they received too little credit for service and filed this suit seeking relief under the Employee Retirement Income Security Act (ERISA). EAHC distributed all of the pension plan's assets to Racine Steel's workers, so if the plaintiffs prevail their recovery will come from the Pension Benefit Guaranty Corporation.

Like many other employers, Racine Steel awarded credit toward pensions for time employees were available to work but could not, through no fault of their own. Sick leave, time on layoff and in military service, and the like count as "service" for purposes of vesting—but only to a point. An employee laid off stops accruing credit when he "incurs a break in seniority under the Basic Agreement"—the collective bargaining agreement in force between Racine Steel and its principal union. The collective bargaining agreement allows employees a minimum of two and a maximum of five years on layoff before they lose their seniority. Plaintiffs contend that during the two to five years after EAHC dismissed them, they continued to earn credit—which would permit some to "creep" into vested benefits and others to achieve higher levels of benefits.

Plaintiffs' argument depends on the terms of the pension plan. Although separate provisions define "continuous service" and "credited service" for pension purposes, we need not explore the subtle differences between these terms. Here is the critical language from section III.1(a)(2) of the Plan:

"Continuous Service Termination Date" is ... the earlier of (i) the date the Employee quits, is discharged or terminated for cause or otherwise, dies, or the last day of the calendar month in which he attains age seventy (70), or (ii) the first anniversary of the date the Employee is absent from service for any other reason. Notwithstanding the foregoing, an Employee shall not incur a Continuous Service Termination Date:

(i) Due to an absence caused by entering the military....

(ii) During periods of absence after August 1, 1964, caused by an Employee's (who is a member of the Union) engaging in or preparing for bargaining negotiations with the Company ...; or

(iii) Until such time as he incurs a break in seniority under the Basic Agreement.

We assume for the sake of argument that clause (iii) applies even though the Basic Agreement was rescinded by mutual consent on April 16, 1987, by an instrument releasing all claims by the union and its members other than those under the pension plan. All then turns on the meaning of "the foregoing" in § 1(a)(2): does it mean that the trailing provisos extend credit to employees after they quit, died, turned 70, or were discharged, or is the reference limited to the clause that speaks of employees "absent from service for any other reason"?

When EAHC took over Racine Steel's pension plan, it appointed four persons to serve as the Pension Committee interpreting and administering the Plan. The Plan grants the Committee authority "[t]o construe the Plan" and "[t]o delegate to proper officers or employees of the Company such duties and responsibilities as it shall determine reasonable". The Committee delegated to one of its members, Warren Strong, the authority to make initial decisions on requests for benefits. Strong turned down all requests that depended on credit for service after April 13, 1987, ex-

plaining that an employee "discharged or terminated for cause or otherwise" cannot earn additional service credits just because his seniority has not been "broken" under the Basic Agreement. Two former employees asked the full Pension Committee to review Strong's decision. Their attorney promised to "provide a more detailed statement of position soon after the Holidays." The statement never arrived and the Committee never acted; instead plaintiffs filed this suit, which the district court certified as a class action and decided in defendants' favor on motion for summary judgment.

The district judge concluded that the clause authorizing the Committee "[t]o construe the Plan" led to deferential review under *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989). See also, e.g., *Foster McGaw Hospital v. Building Material Chauffeurs Welfare Fund*, 925 F.2d 1023 (7th Cir.1991); *Fuller v. CBT Corp.*, 905 F.2d 1055, 1058 (7th Cir.1990); *Exbom v. Central States Health & Welfare Fund*, 900 F.2d 1138, 1141–42 (7th Cir.1990). According to the court, § 1(a)(2) tolerates a reading under which the provisos refer to the one-year extension in § 1(a)(2)(ii) but not to the events listed in § 1(a)(2)(i).

Plaintiffs seek *de novo* rather than deferential review, giving two reasons: first, the delegation to Strong is invalid; second, the Pension Committee, made up exclusively of officers of EAHC, was "interested" in the outcome and hence should not be trusted. Neither persuades. Delegation of initial decision-making is common, essential, and lawful. See 29 U.S.C. § 1105(c)(1); *Willett v. Blue Cross*, 953 F.2d 1335, 1340 (11th Cir.1992). Plans often hire specialists to evaluate claims of disability. E.g., *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685 (7th Cir.1992); *Pokratz v. Jones Dairy Farm*, 771 F.2d 206 (7th Cir.1985). This Plan, in particular, authorizes delegation. Review by the administrative committee satisfies both ERISA's and the Plan's requirements. Two plaintiffs initiated such review but did not follow up; the others did not even seek review; ERISA does not require a plan to review initial decisions unbidden.

As for the "interest" of the Pension Committee: we need not decide how the sliding scale of cases such as *Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d 1048 (7th Cir.1987), applies in light of *Firestone*, because Strong and other members of this Plan's administrative committee were not interested in the outcome. *Van Boxel* and like cases deal with unfunded welfare plans. Managers on the committee may be tempted to exercise discretion in favor of their employer's balance sheet. Racine Steel's pension plan, by contrast, was a defined-benefit plan funded in advance. The company's contractual obligation to pay specified amounts was unaffected by the possibility that some employees would "creep in" to vesting. That decision could affect the allocation of benefits among employees but would not have called for additional contributions from the employer. As things turned out, EAHC topped up the fund before termination in order to avoid a process by which the PBGC would do so and then try to collect from EAHC. Yet plaintiffs do not argue that the money used for this purpose otherwise would have ended in the pockets of Strong or the other members of the Committee. All four were coming to the end of their employment with EAHC and could not have sought to promote their advancement by being stingy. There is correspondingly no reason to treat Strong's conclusions with suspicion.

Deferential review leads quickly to judgment for the defendants. Although "the foregoing" in § 1(a)(2) *could* refer to all of the prior clauses, it makes the most sense as Strong read it. Otherwise resigned, retired, deceased, or fired employees could continue to accrue service credits for as long as five years after they left or died. When rejecting a "creep-in" claim by employees of another firm that closed its doors, this court observed that it would be "nonsensical" to award pension credits to employees let go at the end of a firm's operations. *Ooley v. Schwitzer Division, Household Manufacturing Inc.*, 961 F.2d 1293, 1301 (7th Cir.1992). Although the terms of the pension plans and collective bargaining agreements in *Ooley* differ

from those we must consider, the principle that pension credit ends with the employer's own existence carries over and is a good reason to limit the provisos to § 1(a)(2)(ii). On April 14, 1987, all of the employees were "discharged or terminated for cause or otherwise", bringing pension accrual to a halt. Indeed, another union recognized the point when demanding (and ultimately receiving) severance pay from an employer that released its staff when selling an unsuccessful plant. *Allied Industrial Workers Local 879 v. Chrysler Marine Corp.*, 819 F.2d 786 (7th Cir.1987). Employees let go on the sale of an entire plant are not laid off, with a prospect of recall; they are discharged, which sometimes is to their benefit (severance pay and other terminal packages) and sometimes to their detriment. In treating the sale of the plant to B & R Holdings as closing the books on its obligations, the Pension Committee did not exceed the limits of its power "[t]o construe the Plan".

AFFIRMED.