**SUBURBAN TEAMSTERS OF NORTHERN ILLINOIS WELFARE & PENSION FUNDS, Plaintiff,**

v.

**Paul MOSER, d/b/a Paul Moser Trucking, Defendant.**

**No. 93 C 377.**

United States District Court, N.D. Illinois, Eastern Division.

Oct. 19, 1994.

Hugh B. Arnold, John Joseph Toomey, Arnold & Kadjan, Chicago, IL, for plaintiff.

Gerard C. Smetana, Law Offices of Gerard C. Smetana, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

LINDBERG, District Judge.

Plaintiff, the Suburban Teamsters of Northern Illinois Welfare and Pension Funds ("Welfare and Pension Funds" or "Funds"), has filed a declaratory judgment action against defendant Paul Moser, d/b/a Paul Moser Trucking ("Moser"), seeking a determination of the rights and other legal relations of the parties arising under sections 502 and 515 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 USC §§ 1132, 1145, and under section 301 of the Labor Management Relations Act, 29 USC § 185. The Welfare and Pension Funds are ERISA funds established pursuant to written collective bargaining agreements providing benefits to all persons performing covered work under the agreements. Steven English ("English") was an employee of Moser Trucking and a member of Teamsters Local 673. Pursuant to the collective bargaining agreement between Teamsters Local 673 and Moser Trucking, titled "DuPage County Construction Agreement," Moser made contributions on English's behalf to the Funds.

On November 27, 1991, English was involved in an accident while backing a semi-tractor out of Moser Trucking's driveway. Two days later, English visited his doctor complaining of an injury to his elbow. The physician treated English and released him to return to work on Monday, December 2, 1991. English continued to work for Moser two to three days a week during the winter months hauling fuel oil. On February 22, 1992, Moser fired English for not returning money advanced to him for an overweight violation. English did not file a grievance with the union to contest the discharge.

On March 2, 1992, approximately one week after he was terminated, English filed a worker's compensation claim alleging that he was disabled due to the injuries sustained in the November accident. English and Moser settled the worker's compensation claim approximately five months later on August 24, 1992.

On May 2, 1992, the Funds audited Moser and determined that he owed contributions on behalf of English for the period December 1991 through February 1992. Fund Manager James W. Ewing sent a letter to Moser, informing him of the contributions due for this period and requesting payment.

After Moser failed to pay the delinquent contributions, the Funds filed this action on January 21, 1993. Plaintiff seeks a declaration that Moser owes $3,223.00 in contributions to the Funds on behalf of English. The disputed contributions break down as follows: Moser allegedly owes $607.00 in contributions to the welfare fund and $66.00 in contributions to the pension fund for the period of English's employment from December 2, 1991 to February 22, 1992; Moser also allegedly owes $2,300.00 in contributions to the welfare fund and $250.00 in contributions to the pension fund for the twenty-five week

period of the workers' compensation claim, March 2, 1992 through August 24, 1992.

Defendant Moser has moved for summary judgment on the basis that it has no obligation to make contributions to the Funds for the period of English's workers' compensation claim because English was not a "regular employee ... absent because of occupational illness or injury." English was not a "regular employee" or "absent" during this period because he had been terminated for cause unrelated to the alleged injury. In addition, Moser maintains it owes no contributions for the period December 1991 through February 1992 as English was not performing work covered under the terms of the agreement.

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c). Rule 56 further provides that a party opposing a properly supported motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

■ The parties agree that the facts are not disputed. The issues relating to interpretation of the collective bargaining agreement present questions of law which the court can properly resolve on summary judgment.

■ Section 515 of ERISA requires employers to make pension and welfare fund contributions as promised in collective bargaining agreements to the extent the terms of the agreement are not inconsistent with law. *Central States Pension Fund v. Hartlage Truck,* 991 F.2d 1357, 1360 (7th Cir. 1993). Section 515 provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the

terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 USC § 1145. The Welfare and Pension Funds are not parties to the collective bargaining agreements but are third-party beneficiaries. *Central States v. Gerber Truck,* 870 F.2d 1148, 1151 (7th Cir.1989). The Funds are authorized to pursue collection under 29 USC § 1132(a)(3)(B)(ii), which provides that a civil action may be brought by a participant, beneficiary or fiduciary of an ERISA plan to enforce the terms of the plan.

■ The court must enforce the terms of the collective bargaining agreements when those terms are unambiguous. *Hartlage Truck,* 991 F.2d at 1361, citing *Central States v. Independent Fruit & Produce Co.,* 919 F.2d 1343, 1349 (8th Cir.1990). In order to properly resolve a dispute over contractual terms on a motion for summary judgment, a trial court must determine whether the language of the agreement is ambiguous. See *Hickey v. A.E. Staley Mfg.,* 995 F.2d 1385, 1389 (7th Cir.1993). "A term is ambiguous if it is subject to reasonable alternative interpretations." *Id,* quoting *Taylor v. Continental Group,* 933 F.2d 1227, 1232 (3rd Cir. 1991).

Plaintiff contends that section 9.1(B) of the agreement delegates responsibility to the Funds' Board of Trustees to resolve any disputes as to contributions owed by Moser:

> Any disagreement with respect to the eligibility, time and method of payments, payments during periods of employee illness or disability, method of enforcement of payment and related matters shall be determined by such Trustees.

The Funds maintain that since the trustees have discretion to resolve these disputes, their decision must be reviewed under an arbitrary and capricious standard of review. See *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

Despite the language of section 9.1(B), defendant Moser argues the agreement does not give the trustees any authority (much

less discretionary authority) to interpret or construe the terms of the agreement. Moser contends the agreement *"leaves to the parties* the right to interpret the Agreement where the Agreement is ambiguous and provides no room for the Agreement to be interpreted by third parties contrary to the Agreement's own terms." (Reply at 2) (emphasis in original).

In *Firestone,* the Supreme Court set forth the appropriate standard of review for section 1132(a)(1)(B) actions challenging benefit eligibility determinations:

Consistent with established principles of trust law, we hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

Under *Firestone,* a district court must review a plan administrator's decision to deny benefits *de novo* unless the ERISA plan gives the administrator discretion to determine a claimant's eligibility or to construe the terms of the plan. If the ERISA plan gives the administrator such discretionary authority, the standard of review is arbitrary and capricious. See *Nichol v. Pullman Standard, Inc.,* 889 F.2d 115, 118 (7th Cir.1989); *Fletcher v. Kroger Co.,* 942 F.2d 1137, 1139 (7th Cir.1991).

The Supreme Court in *Firestone* specifically limited its discussion of the appropriate standard of review ·to section 1132(a)(1)(B) actions. The Court did not comment on the applicability of the *de novo* or arbitrary and capricious standards of review to other ERISA actions:

The discussion which follows is limited to the appropriate standard of review in § 1132(a)(1)(B) actions challenging denials of benefits based on plan interpretations. We express no view as to the appropriate standard of review for actions under other remedial provisions of ERISA.

This court has found no Seventh Circuit or district court cases where a *de novo* or arbitrary and capricious standard of review was applied in section 515 actions to recover delinquent employer contributions. See *Indiana State Council of Roofers v. Adams Roofing Co.,* 753 F.2d 561, 564 (7th Cir.1985); *Central States Pension Fund v. Hartlage Truck,* 991 F.2d 1357, 1361–62 (7th Cir.1993); *Central States Pension Fund v. Tank Transport,* 779 F.Supp. 947 (N.D.Ill. 1991). However, none of the agreements at issue in these cases specifically delegated the responsibility to resolve disputes over employer contributions to the fund trustees as in this case.

In *Indiana State Council,* 753 F.2d at 564, the Seventh Circuit held that the provisions of the trust agreement provided the framework under which a court should analyze an employer's obligation to contribute to a health and welfare fund. *Id* at 564, citing *Hinson v. NLRB,* 428 F.2d 133, 139 (8th Cir.1970). The Seventh Circuit found that the trust agreement unambiguously obligated defendants to make contributions only on behalf of employees whose wages were set forth in the collective bargaining agreement. Because helpers' wages were not established in the collective bargaining agreements until 1980, the Court concluded that defendants did not violate section 515 of ERISA by failing to make contributions on behalf of helpers prior to 1980. *Id* at 564.

Similarly, in *Hartlage Truck,* 991 F.2d at 1360, the Seventh Circuit explained that as an initial matter, it must look to the collective bargaining agreements at issue to decide whether the employer was liable for allegedly delinquent contributions. The Court explained that employers are required to make contributions only on behalf of those employees indicated by the agreements. *Id* at 1360. The Court determined that it was unnecessary to look to the plain meaning or dictionary definition of the term "casual employment" as the parties had agreed to a specific definition of the term in the agreements. The Seventh Circuit concluded that the agreements at issue were unambiguous and clearly expressed the parties' intent that the employer need not make contributions to the funds on behalf of casual employees. *Id* at 1362.

These cases require the district court to look to the language of the collective bargain-

ing agreement at issue to determine an employer's obligation to make contributions to the Funds. In this case, the language of the agreement unambiguously delegates the responsibility to resolve disputes over employer contributions to the trustees. Defendant does not articulate how section 9.1(B) is ambiguous and offers no reasonable argument for why the court should disregard this unambiguous language.

*Central States Pension Fund v. Tank Transport,* 779 F.Supp. 947 (N.D.Ill.1991), is the only case this court has found where a district court disregarded the unambiguous language of the collective bargaining agreement that section 515 claims be resolved through grievance committee decisions or arbitration. The court determined that arbitration should not be ordered where there was "an inherent conflict between arbitration and the statute's underlying purpose." *Id* at 950, quoting *Shearson–American Express, Inc. v. McMahon,* 482 U.S. 220, 227, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987). The court explained that the underlying purpose of ERISA is to protect "the interests of participants in employee benefit plans and their beneficiaries ... [by] establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for ... ready access to the federal courts." 29 USC § 1001(b). The district court found the grievance committee/arbitration procedure inconsistent with the underlying purposes of ERISA— especially where the trustee of the fund was not represented on the grievance panel. *Id.* 779 F.Supp. at 951. "It is clear that Central States would have little, if any representation on the grievance panel, and thus, no way to protect their fiduciary interests in the Central States Pension Fund." *Id.* at 951, n. 4.

Unlike *Tank Transport,* no policy reasons exist in this case which would require the court to disregard section 9.1(B) of the agreement. There is no conflict between section 9.1(B) and the underlying purpose of ERISA to protect the interests of participants in employee benefit plans and their beneficiaries. The Funds' interest is obviously protected as section 9.1(B) delegates authority to the Board of Trustees to resolve disputes over employer contributions. In addition, the employer's interest in the dispute is not ignored as section 9.1(G) provides for employer representatives on the Board of Trustees.[1]

Because section 9.1(B) gives the trustees discretionary authority to resolve disputes as to employer contributions, the trustees' determination that contributions were due and owing for English under the agreement[2] will be reviewed under an arbitrary and capricious standard. See *Fuller v. CBT Corp.,* 905 F.2d 1055, 1058 (7th Cir. 1990) (trustees have discretion because the plan provides that trustees are "to construe and interpret the plan"); *Saracco v. Local Union 786 Pension Fund,* 942 F.2d 1213, 1215 (7th Cir.1991) ("the pension plan's trust agreement vests the trustees with discretion '[t]o determine all questions arising in the administration, interpretation and application of the Pension Plan, including questions of eligibility' "); *Fought v. Evans Products Company Racine Pension Plan Agreement,* 966 F.2d 304, 306 (7th Cir.1992) (refusing to

---

1. 9.1(G) provides as follows:

The employer agrees that it is bound by and is a party to the trust agreement creating the health and welfare fund and the pension fund, and all prior and subsequent amendments thereto, as if it had signed the original copy of each of the said trust agreements, both of which said agreements being incorporated herein by reference and made a part hereof; the employer hereby designates as its representatives on the board of trustees of said funds such trustees as are named in said agreements and declarations of trust, as employer trustees together with their successors selected in the manner provided in said agreements and declarations of trust, as they may be amended from time to time; and further agrees to be bound by all action taken by said employer trustees regarding and pursuant to the said agreements and declarations of trust as amended from time to time.

2. The trustees have never issued a written opinion or decision letter setting forth their analysis in determining that contributions were due and owing under the agreement. The court assumes that because the Funds initiated this suit, the trustees did make a determination that English was a covered employee for the period December 2, 1991 to February 22, 1992 and that English was a "regular employee ... absent because of occupational illness or injury" for the period March 2, 1992 through August 24, 1992.

invoke de novo standard after finding that "clause authorizing the Committee '[t]o construe the Plan' led to deferential review under *Firestone* "). A trustees' decision shall not be overturned under the arbitrary and capricious standard "absent special circumstances such as fraud or bad faith, if 'it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome.'" *Exbom v. Central States Health and Welfare Fund,* 900 F.2d 1138, 1142 (7th Cir.1990), quoting *Pokratz v. Jones Dairy Farm,* 771 F.2d 206, 209 (7th Cir.1985).

Section 9.1(E) of the agreement provides for employer contributions as follows:

> If any regular employee is absent because of occupational illness or injury, the required contribution shall be made until the employee returns to work, or for a period of twelve (12) months, whichever is the shorter.

The plaintiff Funds contend that employer contributions are required for the period of English's workers compensation claim (March 2, 1992 to August 24, 1992) because the injuries English allegedly sustained in November 1991 prevented him from working following his termination three months later in February 1992. The Funds assert that English's inability to presently work as a truck driver is sufficient to constitute "absence" under section 9.1(E).

■ ERISA clearly contemplates that "trustees will act to ensure that a plan receives *all funds to which it is entitled.*" See *Central States v. Central Transport, Inc.,* 472 U.S. 559, 571, 105 S.Ct. 2833, 2841, 86 L.Ed.2d 447 (1985) (emphasis added). In this case, however, the finding of the trustees is unreasonable in light of the plain meaning and sequence of the terms "regular employee," "absent," "because of" and "occupational illness or injury." Section 9.1(E) requires employer contributions for up to one year for any regular employee absent because of occupational illness or injury. The terms "regular employee" and "absent" are not defined in the agreement. However, the parties do not dispute that English was a "regular employee" when the accident occurred on November 27, 1991 and that English was *not* a "regular employee" when he filed his work-

ers compensation claim following his termination. If English was not a "regular employee" once he was terminated on February 22, 1992, he similarly could not be "absent" from work following his termination. English was terminated for not returning money advanced to him for an overweight violation. English did not file a union grievance to contest the discharge; he had no expectation of returning to work for Moser. The fact that section 9.1(E) provides for employer contributions until the "employee returns to work" indicates the parties contemplated coverage for employees who could not work for a period of time because of occupational illness or injury. The parties did not contemplate coverage for individuals who had no expectation of returning to work because they had been terminated for cause. In addition, English was never absent "because of" occupational injury while he was employed by Moser. The trustees' finding that Moser is obligated to make payments to the Funds on behalf of English for this period cannot be supported by "a reasoned explanation, based on the evidence" and is therefore arbitrary and capricious.

■ Moser also maintains that it owes no contributions for the period December 2, 1991 through February 22, 1992 because English was not performing work covered under the agreement. English was hauling fuel oil from Indiana to a storage facility in St. Charles, Illinois for Parent Petroleum. According to Moser, English would have been covered if he had been hauling construction materials as provided in section 1.4 of the agreement. The Funds, on the other hand, argue that coverage is determined by the type of truck English used for hauling oil and that the tractor-trailer belonged to the Group 3–5 axle truck classification set forth in section 8.2 of the agreement.

Section 1.3 describes the employees covered under the agreement:

> Employees covered by this agreement are all employees in the classifications of work covered by this agreement, employed by the employers in the contract territory and engaged in the work described in section 1.4 hereof.

Section 1.4, which was referenced in section 1.3, provides as follows:

This agreement shall apply to employees in the classifications herein set forth in the performance of work involved in the following operations.

A. Heavy construction: Heavy construction is defined a constructing substantially in its entirety any fixed structure, other improvement or modification thereof, or an addition or repair thereto, including any structure of operation which is an incidental part of a contract thereof. . . .

B. Highway construction work: Highway construction work is defined as all work ordinarily included in highway construction contracts, bridges, sewer and street grading, street paving, curb setting, sidewalks, etc., and landscaping on work where prevailing wage rules are in effect. . . .

C. Removal and disposal of rubbish from wrecking jobs.

D. Snow removal.

E. Hauling of cinders, slag, asphalt (including liquid asphalt), sand fill and all other types of fill on construction jobs.

F. Delivery to and spreading on the construction site or the road bed of any stabilized base material to be used on a subsurface, including but not limited to fill, poz-o-pac, aggregate materials, bituminous aggregate materials, cement aggregate materials or any other trade name of base or paving material.

G. Back filling.

H. Digging.

I. Leveling and grading.

J. Street sprinkling and flushing.

K. Concrete breaking or sawing or mini concrete planner, or asphalt planner.

L. Pipeline work.

M. Pavement marking and sealing.

N. Construction slag and sludge hauling or any other trucking in or out of steel mills.

O. Hauling of salt.

P. Asphalt plant and end loaders.

Q. The hauling of broken asphalt and recycled asphalt with doser end loaders and rubber tire end loaders also. Precast slabs and pipe.

R. The securing of all loads shall be the drivers responsibility.

S. Concrete pumping on concrete pumping trucks.

T. Concrete breaking and bob cats or end loaders.

U. Cherry picking booms unloading drywall, bag material, brick and all other materials loaded or unloaded from cherry picking boom and flat bed trucks or semi bed trucks or semis.

V. Street sweepers and mini concrete and asphalt planner.

W. Low boys hauling machinery out of or into joint council number 25 shall receive mileage.

According to section 1.4, an employee is covered under the agreement if he or she is performing work described in subsections A through W.[3] These classifications involve construction activities and include the hauling of construction materials.

The Funds' argument that contribution is determined by truck classification is not supported by the plain language of the agreement. Truck classifications are set forth in Article 8 only as a basis for determining the compensation truck drivers are to be paid. Section 8.1 provides:

The following rates of hourly pay shall prevail during the period herein set forth.

Work or services performed at the construction site which includes driving trucks to and from the spreading on the construction site or the road bed of any base material to be used for such a subsurface which shall include but not be limited to fill, gravel, blacktop, cement or poz-o-pac, and building, wrecking, excavating and renovation shall be covered by the hourly rates set forth as follows:

---

**3.** There appears to be no issue that English was employed by Moser in the contract territory (the geographic area covered by the I.B. of T. Joint Council Number 25 area). (See Agreement, §§ 1.1 and 1.3).

8.2 The trucks listed in this section shall be classified and drivers paid on the following axle basis. . . .

The language of section 8.1 further emphasizes that employees are being paid for work being performed at the construction site, which includes the driving of trucks to and from the construction site. The Funds have not argued that English was hauling oil to and from construction sites. Because the plain language of the agreement covers employees performing construction work or hauling construction materials, the trustees' finding that Moser owed contributions for the period when English hauled oil interstate is arbitrary and capricious.

■ Plaintiff also argues that, as a matter of law, contributions are owed on all hours worked by a union employee even if all of the time was not spent in covered employment. See *Operating Engineers Pension Trust v. Soule Steel Co.*, 797 F.2d 791 (9th Cir.1986); *Chicago District Council of Carpenters Pension Fund v. Exhibition Contractors Co., Inc.*, 618 F.Supp. 234 (N.D.Ill. 1985). The cases cited by plaintiff do not stand for this proposition, however. In *Soule,* the master labor agreement ("MLA") required employers to pay contributions to the funds for every hour worked by a union employee "who performs work covered by the MLA, regardless of whether all of the work done was covered by the agreement." 797 F.2d at 791. The court held that the plain language of the agreement controlled and that the employer owed contributions for all hours worked by the operating engineer, including work not covered by the agreement. *Id.* at 793. Similarly, in *Exhibition Contractors,* the court enforced the plain language of the agreements which required employer contributions for each hour worked by a union employee regardless of the type of work performed. 618 F.Supp. at 238. Unlike *Soule* and *Exhibition Contractors,* the agreement in this case contains no language requiring Moser to pay for all work performed by union employees even if the work was not covered under the agreement. Defendant's motion for summary judgment is granted.

ORDERED: Defendant Moser's motion for summary judgment is granted. The court determines the rights and legal relations of the parties as follows: Moser has no obligation under the agreement to make contributions to the Funds for the period March 2, 1992 through August 24, 1992 because English was not a "regular employee . . . absent because of occupational illness or injury." Moser also owes no contributions for the period December 2, 1991 through February 22, 1992 because English was not performing work covered under the agreement.

The Clerk is ordered to enter judgment for defendant Paul Moser, d/b/a Paul Moser Trucking, and against plaintiff, the Suburban Teamsters of Northern Illinois Welfare and Pension Funds, on a separate document pursuant to FRCP 58. The judgment order should also include the above declaration setting forth the rights and legal relations of the parties.